**Affirmed and Memorandum Opinion filed February 14, 2013.**



In The

# 𝕱𝖔𝖚𝖗𝖙𝖊𝖊𝖓𝖙𝖍 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘

---

## NO. 14-12-00801-CV

---

## IN THE INTEREST OF M.S.D., A CHILD

---

**On Appeal from the 387th District Court**
**Fort Bend County, Texas**
**Trial Court Cause No. 11-DCV-191748**

---

## M E M O R A N D U M   O P I N I O N

In this appeal from a judgment terminating her parental rights, Nicole G.[1] asserts that her trial counsel was ineffective and that she was denied due process. She further contends that the evidence is legally and factually insufficient to support the trial court's judgment terminating her parental rights. We affirm.

---

[1] To protect the privacy of the parties in this case, we identify the child's relatives and other adults by their first name only. *See* Tex. Fam. Code § 109.002(d).

# BACKGROUND

The Texas Department of Family and Protective Services (the "Department") received a referral alleging physical abuse to the child the subject of this suit, M.S.D., by her mother, Nicole. The referral stated that M.S.D. had been seen in the past with bruises on her cheeks that appeared to be pinch marks and bumps on her head and that she had been left by Nicole with her grandmother, Bonnie, for over a week without contact. Department investigator Karen Preston began examining the case by interviewing Bonnie. Bonnie told Karen that Nicole had left M.S.D. with her about a week earlier. According to Bonnie, Nicole said she would return to pick M.S.D. up in three days, but Bonnie had not heard from Nicole. Bonnie was unable to provide medical or day care for M.S.D. Preston next contacted Nicole by phone; Nicole told Preston she was in New York and would return in about two weeks. Nicole also falsely claimed to Preston that M.S.D. was with her in New York. The Department developed a safety plan with Bonnie and left M.S.D. in her care, and Bonnie agreed not to release M.S.D. to Nicole without contacting the Department.

Bonnie contacted Preston several days later and told her that Nicole and her boyfriend, Joshua, had returned and had spent the previous night at her home. Bonnie was able to leave the house with M.S.D. that morning and agreed to find alternative housing for the night. Bonnie later returned to her home and entered because she did not see any other vehicles parked at the house. She found Nicole and Joshua inside. She contacted Preston by phone again, stating that she was afraid and could not leave. Preston contacted law enforcement. Officers arrived and arrested Nicole on outstanding traffic violations.

Bonnie bonded Nicole out of jail the next day, and Nicole reported to the Department's offices for an interview. While at the Department, personnel saw

2

Nicole and Joshua arguing in a manner that appeared to be violent. During Preston's interview with Nicole, Preston discovered that Nicole had no permanent residence: she stayed with various people, including Bonnie, Joshua, and a man she met on Craigslist, Mike, for whom she did housework and "organization." Nicole told Preston she planned to take M.S.D. with her to Mike's home, but refused to provide Preston with Mike's address because she could not permit the Department access to his home.

Nicole provided Preston with a letter indicating that she was employed, but Preston was subsequently contacted by the individual who wrote the letter. This person stated that Nicole did not work for him, and he did not intend to employ her. He alleged that Nicole was a prostitute who was using drugs and that Joshua was a drug dealer. Preston also learned that Nicole had a profile on a website called "Sugarbaby or Sugardaddy.com." Nicole told Preston that this was a website where she could meet older men who were looking for companionship, who would pay her a "substantial" amount of money for her attention.

Nicole told Preston that Richard, M.S.D.'s father, was a "monster." Preston investigated Richard's criminal history and found that he had been arrested for domestic violence, drug-related offenses, and carrying a weapon. She also discovered that Joshua had an open Department investigation concerning a child he had with another women. In May 2011, Joshua had been arrested for assaulting this child's mother.

Preston investigated Nicole's history with the Department. She discovered that Nicole had voluntarily relinquished her parental rights to her first child while she was pregnant with M.S.D. This first child was under the emergency temporary conservatorship of the Department at the time. Further, the Department had already been involved in M.S.D.'s life shortly after she was born, when she was

3

removed from Nicole's care and placed with Bonnie for almost a year. Going back even further, Preston discovered that Nicole had been investigated by the Department's Adult Protective Services division for assaulting Bonnie in 2006.

After Preston completed her investigation, she concluded that Nicole was unable to protect M.S.D. based on Nicole's unstable lifestyle, her past and perhaps current drug use, and her involvement with men who had histories of domestic violence and perhaps drug use. She concluded that Nicole "placed her own needs" above those of her child and believed that there was an immediate and continuing danger to M.S.D.'s health or safety. On July 26, 2011, the Department took possession of M.S.D. under section 262.104 of the Texas Family Code, which authorizes the Department to take possession of a child on an emergency basis when there is a reasonable belief that there is an immediate danger to the physical health or safety of the child. M.S.D. was quickly returned to Bonnie's home, but Nicole was not permitted to be around M.S.D.

The parties entered into an agreed temporary order after mediation, in which the Department was named M.S.D.'s temporary managing conservator and Nicole was named her possessory conservator. This order set July 30, 2012 as the date of dismissal of the case. As part of these orders, Nicole agreed to undertake several actions in order to have M.S.D. returned to her, including having a psychological evaluation, undergoing counseling, having a drug and alcohol assessment and testing, following any recommendations made after the drug and alcohol assessment, and demonstrating that she can establish a safe and stable home for M.S.D. Nicole was also ordered to comply with the Department's service plan, including any amended service plans, during the pendency of the suit.

Several permanency hearings were held and permanency orders were entered during the pendency of this case. In the permanency orders, the court

noted what progress, if any, Nicole had made, and ordered Nicole to comply with the Department's service plans, to continue her counseling, and to complete her drug and alcohol assessment and treatment. In the January 11, 2012 permanency hearing order, the trial court set the case for trial on June 13, 2012.

On May 9, 2012, over nine months after M.S.D. was removed from Nicole's care, the trial court conducted its final permanency hearing prior to the trial setting on the Department's original petition. The court incorporated the Department's permanency plan and progress report into the findings in its permanency order. In this report, the Department noted that the primary permanency goal for M.S.D. was unrelated adoption and that the concurrent goal was family reunification. This order established that Nicole had not demonstrated adequate and appropriate compliance with the service plan to enable the Department to return M.S.D. to her custody. Nicole was further ordered to, as is relevant here,

- Attend, participate in, cooperate with, make progress in, and successfully complete counseling sessions designated by the Department or any other provider mutually agreed upon by Nicole and the Department.

- Follow any and all recommendations made as a result of the drug and alcohol assessment, including, if necessary, submitting to and successfully completing a substance-abuse treatment program. If recommended, Nicole was ordered to enroll, participate in, and successfully complete an in-patient drug treatment program.

- Demonstrate that she can establish a safe and stable home for M.S.D. free of abuse, neglect, and anything that would pose a danger of abuse or neglect to M.S.D., including but not limited to maintaining employment, arranging for responsible child care during working hours, successfully completing and demonstrating that progress has been made in all court ordered services, and obtaining suitable housing providing for M.S.D.'s basic necessities.

- Comply with each requirement set out in the Department's original or any amended service plan during the pendency of this suit.

The trial court ordered the parties to mediation on the Department's motion on June 1, 2012. The record contains a motion for sanctions filed by the Department on June 6, 2012. In this motion, the Department sought sanctions against Nicole's counsel for the following. On May 30, Nicole's counsel advised the Department's counsel by email that she was sending her assistant to the court-ordered mediation set for June 1. All parties, counsel for the Department and M.S.D.'s ad litem, and Nicole's counsel's assistant appeared for the mediation as scheduled. The assistant informed the mediator that he was not an attorney and that he had spoken with Nicole's counsel and was told that no mediation agreement would be reached. The mediation was canceled by the mediator. Despite Nicole's counsel's failure to comply with the trial court's order to mediate, there is no sanctions order in the record.

At the bench trial on the petition to terminate held in the summer of 2012,[2] the following relevant evidence was presented. Nicole testified regarding her employment history from the time of M.S.D.'s emergency removal to the time of trial. She stated that she had worked at Kruger Marketing Group in door-to-door sales for about two months. She said that, after she became pregnant with another child while M.S.D. was under the Department's conservatorship, she was unable to work because she was "very ill with pregnancy related issues." Nicole admitted that she had used marijuana during the time from September of 2011 to January of 2012 to help with her morning sickness during her pregnancy. She testified that she has since stopped smoking marijuana.

---

[2] The termination proceedings were conducted on June 18, 19, 20, and 28, 2012. The trial was then recessed until July 5. On the morning of July 5, M.S.D.'s father, Richard, appeared unrepresented at the trial. The court appointed counsel to represent Richard and recessed the trial until August 2011. Trial recommenced on August 15, 2011.

Nicole testified that she placed the child with whom she became pregnant with an adoptive family in California. According to Nicole, this adoptive family had paid for the apartment she has lived in since January and had provided her with some "necessities." Their support was to stop at the end of June. Nicole testified that she was currently working at a realty firm as an office manager, making $12.00 an hour and a three percent commission on some property transactions. She acknowledged that she has not yet made any commissions and had been working there only two weeks. According to Nicole, she was working towards getting her real estate license; she had completed the education requirements on line and was waiting to take the state licensing exam.

Nicole admitted that she had not completed the in-patient drug rehabilitation plan recommended after the assessment. She testified that at first, she refused to participate in the program because she thought it was unnecessary. She was between attorneys when the recommendation was made, and she wanted to talk to her counsel because she did not agree with it. She acknowledged that the program she refused to enter was one that would have permitted a child to live with her while she was in treatment. At the time of trial, however, she stated that she was in agreement with the recommendation and "just hadn't done it yet." Nicole also testified that she had attended "AA and NA" meetings, but admitted that she had used drugs during some of the times she was allegedly attending these meetings. She also admitted that she had been diagnosed with bipolar disorder, but was not taking any medications. However, she also testified that she had no current diagnosis of bipolar disorder.

Regarding her court-ordered counseling, Nicole explained that she had attended some counseling sessions in November 2011, but had stopped going. She also acknowledged that she failed to attend her initial assessment, she missed

7

several appointments, and she did not attend any counseling from December 2011 to April 2012. She blamed her lack of attendance on the long waits she had endured at the initial counseling location because of paperwork problems. She testified that she preferred a female counselor and that the Department made arrangements for her to see a female counselor. Nicole started seeing that counselor in April 2012, but missed several sessions. Nicole testified that her counselor ultimately suspended her treatment until she submitted to substance-abuse counseling.

Nicole explained her plans if M.S.D. were returned to her. She stated that she planned to re-enroll M.S.D. in a day care that she had been enrolled in, continue working, and spend her time off starting and finishing services to which the Department had referred her. She explained that she would "try to be the best person . . . and the best mother" she can be. When asked why she would continue or even start services, such as in-patient drug treatment, when the Department was out of the case, she responded that she needed to make changes regardless of the Department's involvement. She also testified that she was no longer involved with Joshua. She further acknowledged that, although M.S.D. was nearing three years of age, she had only had "complete care, custody and control" of M.S.D. for "[m]aybe three months, four months."

Bonnie testified that when M.S.D. was about four months old, she lived with Bonnie "for about a year" until the Department returned her to Nicole. M.S.D. continued to stay with Bonnie most weekends until May 2011, when Richard "kicked" Nicole and M.S.D. out of his apartment. Following Nicole and Richard's break-up, Nicole and M.S.D. continued to live with Bonnie. Nicole worked at night and watched M.S.D. during the day, and Bonnie worked during the day and kept M.S.D. at night. Although Nicole sometimes stayed elsewhere overnight, this

general pattern continued until Nicole left for New York and the Department became involved.

Bonnie testified that during all the times that she has cared for M.S.D., Nicole has not provided any food, money, or other resources, other than some formula that Nicole provided early on. She also related that [Nicole] has been "in and out" living different places with M.S.D., "mov[ing] from man to man" and "place to place," and is "not able to provide a stable home for [M.S.D.]." Bonnie also expressed concerns about some of Nicole's relationships in which fighting— none of which Bonnie described as physical—occurred in M.S.D.'s presence. Bonnie stated that she had had to remove M.S.D. from the area when Nicole and one of her previous boyfriends had been fighting and that a restraining order had been obtained against this particular boyfriend.

Bonnie described M.S.D. as a happy child, who does not ask for Nicole. She explained that although Nicole is good with M.S.D. when Nicole has her for a short time, she does not believe that Nicole can parent "consistently." Bonnie testified that she does not believe that Nicole can put M.S.D. first. According to Bonnie, Nicole has not changed over the course of this case, and Bonnie does not believe that Nicole is able to support herself or provide a stable home for M.S.D. Bonnie stated that she believes M.S.D. should remain with her current foster family rather than being returned to her daughter Nicole.

Two court appointed special services advocates for M.S.D. testified. Both advocates testified that they had observed visits between Nicole and M.S.D. The advocates agreed that, although their interactions were "appropriate," Nicole and M.S.D. did not appear to have a nurturing mother-daughter bond. One of these advocates testified that, because of Nicole's history of drug use and neglect of M.S.D., she did not believe that Nicole could provide a safe and stable home for

M.S.D. The other advocate testified that she believed it is in M.S.D.'s best interest to remain in her current placement with the foster family. The current foster parents of M.S.D. also testified. They both stated that they love M.S.D., that she has bonded well with their family, and that they would like to adopt her. They stated that M.S.D. was happy in their home and doing very well. M.S.D. refers to them as "mommy" and "daddy." They testified that they intend to continue allow Bonnie to contact with M.S.D. and that they are "open" to Nicole's having a relationship with M.S.D. if that relationship is positive and beneficial to M.S.D.

Department caseworker Araby Sticksel was assigned to M.S.D.'s case in August 2011. She explained that in December 2011, the permanency plan for M.S.D. changed from family reunification to unrelated adoption due to Nicole's lack of progress in the family plan and her repeated failure to attend her scheduled visitation with M.S.D. She stated that Bonnie was unable to take M.S.D. on permanently because of her age and health. The Department identified and evaluated a potential adoptive family and placed M.S.D. with that family on a foster care basis. Bonnie continued to interact with M.S.D. while she was placed with this family, and the family agreed that Bonnie could remain a part of M.S.D.'s life if they adopted her.

Sticksel testified that Nicole tested positive for marijuana after M.S.D. had been removed from her care. She explained that after Nicole completed her drug assessment, it was recommended that she be placed in an in-patient treatment facility. The assessment, along with the entirety of the Department's record regarding Nicole, was admitted into evidence. The assessment indicates that Nicole reported using marijuana from the age of fifteen, alcohol at the age of eighteen, and had used both methamphetamines and the prescription drug Xanax. Nicole further reported that has had "multiple involvements with the legal system,

10

all of them related to substance abuse." Nicole informed Sticksel that, rather than submitting to in-patient treatment as recommended by the assessment, she wanted to have another assessment done. Nicole again tested positive for marijuana in January 2012.[3] Sticksel received no indication that Nicole had arranged another assessment until July 2012, when she received a fax from another drug treatment program. This fax indicated that Nicole had scheduled an assessment in June 2012, but Nicole did not attend the scheduled assessment. According to Sticksel, Nicole told her she had attended one AA meeting before trial, but could offer no proof to Sticksel that she had done so.

Sticksel confirmed that Nicole was required to attend counseling under the plan, but had failed to do so. She corroborated Nicole's testimony that her counseling sessions were cancelled due to her non-attendance and the requirement that she start substance-abuse treatment. Sticksel further related that Nicole missed numerous scheduled visits with M.S.D. and that the Department moved the location of the visits because Nicole reported having transportation problems. But Nicole also missed visits with M.S.D. after the location was moved. Sticksel stated that she supervised numerous visits that Nicole had with M.S.D. According to Sticksel, although she observed that the two had a bond, she did not believe it was a strong bond. Sticksel testified she never saw M.S.D. become upset or anxious when separating from Nicole.[4]

Sticksel testified that Nicole's willingness to participate in services was intermittent. She explained that Nicole acknowledged the need to make changes in her life, but Sticksel did not believe that Nicole had actually made any significant

___

[3] As noted above, Nicole admitted using marijuana while pregnant with her third child to help with morning sickness during this time period.

[4] Nicole testified that M.S.D. cried and clung to her at the end of their visits.

11

changes during the course of the case. Sticksel testified that "once it looked like the trial was coming, [Nicole] seemed to think she needed to kick it in high gear" but it seemed to come "a little late."

According to Sticksel, Nicole never provided the Department with an address where she was residing. In September 2011, Sticksel attempted to see Nicole at Joshua's apartment, but Nicole told her they had broken up because Joshua was "selling marijuana." In December, Nicole told Sticksel she was living with a friend but did not provide an address. In January 2012, Nicole reported that she was living with her biological mother but told Sticksel that this home was not suitable because her mother used drugs and her mother and grandmother drank alcohol and got into disagreements. As of the beginning of the termination proceedings, Sticksel had not seen any of Nicole's residences. Sticksel also testified that Nicole claimed to have had multiple jobs but provided Sticksel with only one paystub.

Sticksel explained that Nicole has a pattern of associating with men who have histories of domestic violence and drug use, has a history of drug use herself, and has not shown any ability to provide a stable and safe environment for M.S.D. According to Sticksel, Nicole has inadequate parenting skills, and it would not be in M.S.D.'s best interest to be returned to her. Sticksel believed that termination of Nicole's parental rights and adoption of M.S.D. by her current foster family is in M.S.D.'s best interests because the foster family "can provide [M.S.D.] with a safe and stable home, with a family unit she can consistently be with and grow up in, free from drug use."

As noted above, the trial court recessed the trial on July 5, 2012 because M.S.D.'s biological father, Richard, had appeared in court. The trial court appointed counsel to represent him and continued the hearing until August.

12

Nicole's counsel moved for a mistrial because of the father's late appearance, but the trial court did not rule on the motion. During the recess, Richard voluntarily relinquished his parental rights to M.S.D.

On August 15, 2012, when the trial reconvened, Nicole was not present. Sticksel again took the stand. She testified regarding Richard's relinquishment of his parental rights. She also explained that, during the recess, she had attempted to make a home visit to Nicole's new apartment, but Nicole was not there. She stated that she observed Joshua, whom Nicole had testified she was no longer seeing, leaving the apartment complex on Nicole's moped. According to Sticksel, personnel in the leasing office told her that Joshua was "the guy that's not supposed to be in the apartment complex."

Sticksel testified that Nicole was being held in the Brazoria county jail for the manufacture and delivery of synthetic marijuana. According to the complaint, which was admitted into evidence over Nicole's counsel's objection, a Brazoria County Sherriff's investigator arranged to purchase illegal synthetic marijuana through an ad on Craigslist. On July 19, 2012, he met Nicole and another person for delivery of the drugs. Nicole and two others were found to be in possession of 38.49 pounds of the drug, and Nicole was arrested and charged with delivery of a controlled substance. According to Sticksel, when she visited Nicole in jail, Nicole said she could not pay her $125,000.00 bond, was going to have to wait thirty days before she could seek a reduction, and would be losing her apartment due to her incarceration. Sticksel stated that as of the last day of trial, Nicole was without a stable home, appeared to be doing drugs again, and had no ability to bond herself out of jail.

Shortly after Sticksel's testimony, the Department and M.S.D.'s attorney ad litem rested their cases. Without calling any witnesses, Nicole's counsel also

rested. The trial court announced that it would be entering orders terminating both parents' rights. On August 22, 2012, the trial court filed orders terminating the parental rights of Nicole and Richard. Nicole's counsel filed a notice of accelerated appeal and requested a "free appeal" based on Nicole's indigency. This appeal timely ensued thereafter.

## ANALYSIS

In her first issue, Nicole asserts that her trial counsel was ineffective. In her second issue, she contends that she was denied due process when the trial court continued her trial in her absence after the July recess. In her third issue, she challenges the legal and factual sufficiency of the evidence supporting termination under Texas Family Code section 161.001(1). Finally, in issue four, she argues that the evidence is legally and factually insufficient to support the trial court's finding that termination was in M.S.D.'s best interests.

### A. Ineffective Assistance of Counsel

### 1. Standard of Review

A parent in a parental termination proceeding is entitled to effective assistance of counsel, a right which is assessed under the same standard as that set for criminal defense counsel in *Strickland v. Washington*, 466 U.S. 668, 681 (1984). *In re M.S.*, 115 S.W.3d 534, 544–45 (Tex. 2003). To demonstrate ineffective assistance in a given case, a parent must first show that counsel's performance was deficient. *Id.* at 545. Once deficiency has been established, the parent must show that counsel's deficient performance prejudiced the parent's case. *Id.* Concerning whether particular representation was deficient, we must consider all circumstances surrounding the case and determine whether counsel was "reasonably effective." *Id.* In doing so, we provide great deference to

14

counsel's performance, indulging "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* Only if counsel's conduct is "so outrageous that no competent attorney would have engaged in it," will we find such performance deficient. *Id.* In conducting the harm analysis under the second prong of *Strickland*, reviewing courts must determine whether there is a reasonable probability that, but for the deficient performance, the result of the proceeding would have been different. *Id.* at 550. Any allegation of ineffective assistance must be fully supported by the record. *Doe v. Brazoria County Child Protective Servs.*, 226 S.W.3d 563, 572 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

## 2. Application

Nicole asserts that her trial counsel's performance was deficient because her counsel failed to: (1) attend court-ordered mediation on June 1, 2012; (2) move for continuance once she learned that her Nicole could not be present at trial on August 5, 2012; (3) request a bench warrant to secure Nicole's presence at trial; (4) object to the trial's continuing without Nicole's presence; and (5) move for a new trial. She further asserts that these deficiencies effectively deprived her of the right to counsel, such that prejudice should be presumed. *See U.S. v. Cronic*, 466 U.S. 648, 659 ("The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable."). If prejudice is not presumed, she argues that if not for her counsel's unprofessional errors, the result of this proceeding likely would have been different. *Strickland*, 460 U.S. at 687.

First, we disagree with Nicole's assertion that she was effectively deprived of the right to counsel. Our review of the record indicates that, prior to the final day of trial when Nicole was not present and had been arrested on a drug-related charge, her counsel thoroughly cross-examined the Department's witnesses, often questioning them longer than the Department did. She took several witnesses on voir dire regarding how they had obtained certain knowledge, which resulted in numerous objections to testimony being sustained. Nicole's counsel filed a motion to dismiss at the conclusion of Preston's testimony, asserting that the Department had failed to establish grounds for M.S.D.'s emergency removal from Nicole's care. She further made an oral motion for a mistrial when Richard appeared late in the proceedings and the trial court recessed the trial. Finally, she timely filed a notice of accelerated appeal and requested a free record due to Nicole's indigency. The Department's case was subjected to "meaningful adversarial testing." Thus, we will apply the *Strickland* standard to review Nicole's ineffectiveness claim.

Nicole first asserts that her counsel was ineffective for failing to attend the June 1, 2012 court-ordered mediation. Rather than attending herself, Nicole's counsel notified the Department that she was sending her assistant, whom counsel indicated was experienced with mediation. Her counsel also informed the Department that she would be available by phone. Mediation did not occur, and the Department filed a motion for sanctions against Nicole's counsel. In this motion, the Department stated, "Brandon [the assistant] stated he had spoken with [Nicole]'s counsel and was informed no agreement would be reached." Nothing in our record reflects that this motion was heard or ruled upon by the trial court, nor does the record reveal why counsel did not attend the mediation. Further, Nicole has provided us with no authority indicating that such behavior is "so

16

unprofessional that no competent attorney would have engaged in it." *In re M.S.*, 115 S.W.3d at 545.

Nicole next directs us to her counsel's failure to object to Nicole's absence on the final day of trial or otherwise ensure her presence by moving for a continuance or obtaining a bench warrant to secure her presence and her counsel's failure to present a "case in chief" on her behalf. This court has already considered an ineffective-assistance-of-counsel claim based on a parent's absence at a termination hearing. *In re K.M.H.*, 181 S.W.3d 1 (Tex. App.—Houston [14th Dist.] 2005, no pet). In *K.M.H.*, the father, an inmate in "boot camp" when his parental rights were terminated; was not present at all for the termination trial. *Id.* at 12–13. On appeal, he complained that his counsel was ineffective for failing to make arrangements for his presence at trial. *Id.* at 12. In determining that his counsel was not ineffective for failing to secure his presence, we stated, "[The father] was represented by counsel, and he has not shown he was denied an opportunity to communicate with counsel. [The father] also has not shown the substance of any testimony he would have given, or how such testimony would have affected the trial court's decision." *Id.* at 13. Likewise, here, Nicole has not established any of these factors.

More important to our determination in *K.M.H.*, however, was the lack of an explanation in the record as to counsel's failure to secure a bench warrant, which could have been a tactical decision. *Id.*; *see also id.* at 15 (Yates, J., concurring) ("Despite the importance of a parent's presence at a termination hearing, a strategic choice not to appear is possible."). Here, as in *K.M.H.*, there is no explanation in our record for her counsel's failure to (a) secure her presence on that day or (b) present a case on her behalf.[5] In reviewing a claim of ineffectiveness of counsel,

_____

[5] Nicole testified that drugs would always be an issue in her life and that she hoped she

we presume competent performance. *In re M.S.*, 115 S.W.3d at 145; *In re K.M.H.*, 181 S.W.3d at 15 (Yates, J., concurring). The record here is insufficient to overcome this presumption. *In re K.M.H.*, 181 S.W.3d at 13; *id.* at 15 (Yates, J., concurring); *see also In re K.L.L.H.*, No. 06–09–0067–CV, 2010 WL 78043, at *7 (Tex. App—Texarkana, Jan 12, 2010, no pet.) (mem. op.) (concluding that counsel was not ineffective for failing to call witnesses or introduce evidence in case in chief where record was silent regarding counsel's reasoning, and decision not to put on evidence could have been trial strategy). For the foregoing reasons, we overrule Nicole's first issue.

## B. Due Process

For the first time on appeal, Nicole complains that her due-process rights were violated by the trial court's continuing the termination proceeding in her absence. The record does not indicate that Nicole's due-process complaint was presented to the trial court. Therefore, she has failed to preserve this issue for our review. *See In re L.M.I.*, 119 S.W.3d 707, 708 (Tex. 2003) ("[A]dhering to our preservation rules isn't a mere technical nicety; the interests at stake are too important to relax rules that serve a critical purpose."); *In re A.L.E.*, 279 S.W.3d 424, 431 (Tex. App.—Houston [14th Dist.] 2009, no pet.). "Requiring parties to preserve their complaints in family-law cases furthers the legislative intent that such cases be resolved expeditiously and with finality." *In re A.L.E.*, 279 S.W.3d at 431 (citing *In re L.M.I.*, 119 S.W.3d at 711 and *In re B.L.D.*, 113 S.W.3d 340, 354 (Tex.2003)). Accordingly, we overrule Nicole's due-process complaint and turn to her legal and factual sufficiency challenges.

---

would be able to abstain. She further testified that the only way she could convince the trial court that she would not use marijuana again was by giving her word and letting her behavior show her commitment to abstaining. In light of her history of drug use, this testimony, and the nature of her arrest, her counsel could have determined that having her available for cross-examination by the Department would have been more harmful than beneficial.

## C.  Sufficiency of the Evidence

### 1.  Standard of Review

Parental rights can be terminated only upon proof by clear and convincing evidence that (1) the parent has committed an act prohibited by section 161.001(1) of the Texas Family Code and (2) termination is in the best interest of the child. Tex. Fam. Code § 161.001(1), (2); *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.' " *In re E.R.*, —S.W.3d—, —, No. 11-0282, 2012 WL 2617604, at *1 (quoting *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982)).

In conducting a legal-sufficiency review in a parental termination case, a reviewing court looks at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005). In reviewing termination findings for factual sufficiency, reviewing courts must give due deference to the fact-finder's resolution of factual questions. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The court then determines whether the evidence is such that a fact-finder could have reasonably formed a firm belief or conviction about the truth of the allegations against the parent. *Id.* at 25.

### 2.  Termination Under Subsection 161.001(1)(O)

In issue three, Nicole challenges the sufficiency of the evidence to support the trial court's findings under Texas Family Code section 161.001(1). Only one

basis is required to support termination under subsection 161.001.[6]  We focus on the following ground for termination stated in the trial court's judgment terminating Nicole's parental rights:

> [Nicole] failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

*See* Tex. Fam. Code § 161.001(1)(O).[7]

In her brief, Nicole admits that she did not comply with all of the provisions of the court's order establishing the actions she needed to take to have M.S.D. returned to her:

> While it is true that [Nicole] did not successfully complete the requirements of her court ordered family plan, there's evidence to support the fact that it was not through a refusal to comply.  In fact, [Nicole] completed a number of her required services.  [Nicole] took parenting classes and completed her G.E.D.  Further there was evidence that she attempted to start a number of services, including drug and psychological counseling, but had difficulty due to the service providers not meeting her requirements.  At trial [Nicole] testified that she had a difficult pregnancy with many medical issues.  While she was pregnant she had difficulty holding a job, difficulty maintaining stable housing, and difficulty completing her court-ordered services.  Nicole testified that she never disagreed with her need for services and the record reflects that she completed a

---

[6] *See, e.g.*, *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.").

[7] As detailed above, M.S.D. was removed from Nicole's care under Chapter 262 for abuse or neglect on July 26, 2011.  And, at the time of her trial in July 2012, more than the requisite nine months had passed.  Further, Nicole does not challenge either of these requirements of subsection 161.001(1)(O).

20

substantial number of them. [Nicole]'s pregnancy last[ed] nearly the entire length of the temporary placement, [and] there is substantial evidence that her failure to comply with the family plan was not willful. She simply needed more time and service providers that met her needs.

Regardless of her stated reasons, it is undisputed that Nicole failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of M.S.D. *See id.*; *see also In re M.G.*, No. 14-09-00136-CV, 2009 WL 3818856, at *9–10 (Tex. App.—Houston [14th Dist.] Nov. 17, 2009, no pet.) (mem. op.) (holding that failure to comply with order provided statutory basis for termination under section 161.001(1)). At the time of the termination proceeding, Nicole admitted she had not completed her substance-abuse counseling or psychological counseling. Additionally, as discussed above, Araby Sticksel testified that Nicole had not demonstrated her ability to provide a safe and stable home for M.S.D. In fact, on the last day of the proceeding, Nicole had been arrested and told Sticksel that she would not be able to keep her current apartment.

As discussed *supra*, the trial court's last permanency order specifically established that Nicole needed to complete these actions to obtain M.S.D.'s return. Nicole failed to comply with this order; neither substantial compliance nor excuses for failing to comply suffice to avoid a termination finding under subsection 161.001(1)(O). *See In re T.T.*, 228 S.W.3d 312, 319-20 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (holding that substantial compliance is not sufficient to avoid a termination finding under section 161.001(1)(O)); *In re T.N.F.,* 205 S.W.3d 625, 630–31 (Tex. App.—Waco 2006, pet. denied) (indicating that the parents must comply with every requirement of the court order and holding that section 161.001(1)(O) does not allow for consideration of excuses as to why parents failed to comply with all provisions of the court's order); *In re D.L.H.,* No.

04–04–00876–CV, 2005 WL 2989329, at *2 (Tex. App.—San Antonio Nov.9, 2005, no pet.) (mem.op.) (rejecting parents' arguments that substantial compliance is sufficient to avoid a finding under section 161.001(1)(O)).

Based on the foregoing evidence, a reasonable factfinder could have formed a firm belief or conviction that Nicole failed to comply with court orders establishing actions necessary for the return of M.S.D. from the Department's possession. The evidence was therefore legally and factually sufficient to support the trial court's termination finding under subsection 161.001(1)(O). We overrule Nicole's third issue.

### 3. M.S.D.'s Best Interest

In her fourth issue, Nicole asserts that the evidence is insufficient to support the trial court's finding that termination of her parental rights is in M.S.D.'s best interests. In reviewing the evidence on this termination element, we keep in mind the strong presumption that a child's best interest is served by maintaining the parent-child relationship. *In re J.I.T.P.*, 99 S.W.3d 841, 846 (Tex. App.—Houston [14th Dist.] 2003, no pet.) (citing Tex. Fam. Code §§ 153.131(b), 153.191, and 153.252). Additionally, our legislature has determined that the prompt and permanent placement of the child in a safe environment is presumed to be in her best interest.[8] *See* Tex. Fam. Code § 263.307(a). In *Holley v. Adams*, the Texas

---

[8] The following factors should be considered when determining whether the child's parents are willing and able to provide the child with a safe environment: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of harm to the child; whether the child has been the victim of repeated harm after the initial report and intervention by the Department; whether the child is fearful of living in or returning to her home; the results of any psychiatric, psychological, or developmental evaluations of the child, her parents, her family members, or others who have access to her home; any history of abusive or assaultive conduct by the child's family or others who have access to the child's home; any history of substance abuse by the child's family or others who have access to the child's home; whether the perpetrator of any harm to the child has been identified; the willingness of the child's family to seek out, accept, and complete counseling

22

Supreme Court set forth a list of factors that courts have considered in ascertaining the best interest of a child.[9]  544 S.W.2d 367, 371–72 (Tex. 1976).  These factors are neither required to be present in any particular case, nor exclusive of other possible considerations.  *See id.* at 372.  We will keep all of the relevant factors in mind while assessing the evidence concerning best interest.

Nicole has not established that she can provide a stable home for M.S.D. She had held a permanent job for only two weeks when the trial commenced. There is nothing in the record to indicate whether this employment will continue after her arrest.  Nicole also admitted to Department caseworker Sticksel that she would be losing her current residence as a result of her arrest.  A parent without stability, income, or a home is unable to provide for a child's physical and emotional needs.  *See In re C.A.J.*, 122 S.W.3d 888, 894 (Tex. App.—Fort Worth 2003, no pet. (determining evidence was sufficient to support best-interest finding when mother admitted being unable to care for child and having no stable source of income or permanent home).

Nicole also admitted using marijuana before she had M.S.D. and while she was pregnant with her third child.  *See* Tex. Fam. Code § 263.307(b)((8); *D.O.H. v. Tex. Dep't of Family & Protective Servs.*, No. 14-10-00725-CV, 2011 WL

services and to cooperate with and facilitate the Department's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills; and whether an adequate social support system consisting of an extended family and friends is available to the child.  Tex. Fam. Code § 263.307.  These factors overlap with the *Holley* factors noted *infra* in many areas.

[9] These factors include:  the desires of the child; the emotional and physical needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parenting abilities of the parties seeking custody; the programs available to assist the parties seeking custody; the plans for the child by the parties seeking custody; the stability of the home or proposed placement; the acts or omission committed by the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976).

3684568, at \*5 (Tex. App.—Houston [14th Dist.] Aug. 23, 2011, no pet.) (mem. op.) (noting that a parent's use of illicit drugs is a factor supporting a trial court's finding that termination is in a child's best interests). Nicole's failure to complete her substance-abuse treatment, as well her failure to complete her court-ordered counseling sessions,[10] also demonstrate that she is unwilling to take advantage of the services offered to her by the Department. *In re W.E.C.*, 110 S.W.3d 231, 245 (Tex. App.—Fort Worth 2003, no pet.). These facts cast serious doubt on Nicole's parenting abilities,[11] despite her testimony that she plans to avail herself of community services to become a better parent should M.S.D. be returned to her. Further, Nicole has not effected positive personal changes within a reasonable time or identified an adequate social support system to assist her in caring for M.S.D. *See* Tex. Fam. Code § 263.307(b)(11), (13).

M.S.D.'s foster parents are providing a stable and appropriate home for her and are interested in adopting her, providing her the permanence that she needs. Department workers and the foster parents testified that M.S.D. has bonded with her foster family and is doing well in her placement. Bonnie also testified that M.S.D. would be more appropriately cared for in her current placement. Nicole has not established that she can provide the stability, permanence, and safe environment needed by a young child such as M.S.D. *See* Tex. Fam. Code § 263.307(a). The need for permanence is paramount in considering a child's present and future needs. *See id.*; *In re S.J.*, 14-07-00785-CV, 2009 WL 442485, at \*7 (Tex. App.—Houston [14th Dist.] Feb. 24, 2009, no pet.) (mem. op.) (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ)).

---

[10] Nicole completed her court-ordered anger management classes shortly before the commencement of the termination proceedings.

[11] *See* Tex. Fam. Code § 263.307(b)(8), (10).

These facts all support the trial court's finding that termination is in M.S.D.'s best interest.  The trial court had both legally and factually sufficient evidence to form a firm belief or conviction that termination of Nicole's parental rights was in M.S.D.'s best interest.  Accordingly, we overrule Nicole's fourth issue.

## CONCLUSION

Having overruled each of Nicole's issues, we affirm the trial court's judgment terminating her parental rights.

/s/    Adele Hedges
Chief Justice

Panel consists of Chief Justice Hedges and Justices Brown and Busby.